# EXHIBIT 3

DocuSign Envelope ID: 89AA799C-46BE-46FB-87AD-8D20B9BE4D3E

**EXECUTION COPY**

## MASTER DISTRIBUTION AND BROKERAGE AGREEMENT

THIS MASTER DISTRIBUTION AND BROKERAGE AGREEMENT ("Agreement") is made as of March 29, 2018 ("Effective Date"), by and between Select Three, LLC   (the "Supplier"), and Southern Glazer's Wine and Spirits, LLC and its affiliated entities identified on Exhibit A hereto (referred to herein collectively as "Southern Glazer" or "SG").

1. Definitions. When used in this Agreement:

   a. "Additional Percentage" shall mean a fraction, the numerator of which is the Additional Amount achieved in accordance with the below chart based on the total cases sold by Supplier since the Effective Date in the United States and Canada and the denominator of which is the sum of 4,400,069 plus the Additional Amount plus the Future Issuances.

| Total Cases Sold by Supplier (U.S. and Canada) since Effective Date | Additional Amount |
|---|---|
| 10,000 | 97,800 |
| For each Case above 10,000 | 9.78, up to a maximum 489,000 |

   b. "Case" shall mean a 9-liter case or its equivalent.

   c. "Change of Control" shall be deemed to have occurred if an event set forth in any one of the following paragraphs occurs during the Term:

   (i)     any person other than a member (or owner) of the Supplier as of the date hereof, or an affiliate (as defined in Rule 12b-2 promulgated under Section 12 of the Securities Exchange Act of 1934, as amended (the "Exchange Act")) or family member of any such member, is or becomes the Beneficial Owner (as defined in Rule 13d-3 under the Exchange Act), directly or indirectly, of securities of Supplier (not including in the securities beneficially owned by such person any securities acquired directly from Supplier or any of its affiliates) representing more than 50% of the combined voting power of Supplier's then outstanding securities;

   (ii)    there is consummated a merger or consolidation of Supplier with any other business entity, other than a merger or consolidation immediately following which the individuals who comprise the governing board of Supplier immediately prior thereto constitute at least a majority of the governing board of the entity surviving such merger or consolidation or, if Supplier or the entity surviving such merger is then a subsidiary, of the ultimate parent thereof;

   (iii)   the members of Supplier approve a plan of complete liquidation or

SGWS 0002384

dissolution of Supplier or there is consummated a sale or disposition by Supplier of all or substantially all of Supplier's assets, other than (A) a sale or disposition by Supplier of all or substantially all of Supplier's assets to an entity, more than 50% of the combined voting power of the voting securities of which are owned by members of Supplier following the completion of such transaction in substantially the same proportions as their ownership of Supplier immediately prior to such sale, or (B) a sale or disposition of all or substantially all of Supplier's assets immediately following which the individuals who comprise the governing board immediately prior thereto constitute at least a majority of the governing board of the entity to which such assets are sold or disposed or, if such entity is a subsidiary, the ultimate parent thereof;

(iv)   an initial public offering of Supplier.

d.   "COGS" shall mean Laid-in Cost, plus state excise taxes (if based on depletions) and price support activities (such as depletion allowance, negative depletion allowance, discount participations, free goods and customer quantity discounts).

e.   "Contract Year" shall mean the twelve month period from and following the Effective Date or the anniversary of the Effective Date.

f.   "Future Issuances" shall mean the additional units of Supplier that have been issued since the date hereof

g.   "Gross Profit" shall mean SG NSV less SG's COGS when Southern Glazer acts as a distributor or vendor of record, but shall mean commissions when Southern Glazer acts as a broker or manufacturer's representative.

h.   "Initial Percentage" shall mean a fraction, the numerator of which is 231,582.58 and the denominator of which is 4,631,651.58 plus the Future Issuances.

i.   "Laid-In Cost" shall mean components of inventory cost including the selling price for the Products billed by Supplier, land and ocean freight (for Products not shipped at Supplier's expense), Federal import taxes and related duties (for direct import items), and state excise taxes (if based on receipts).

j.   "Products" shall mean the alcoholic or non-alcoholic beverages set forth in <u>Exhibit B</u>, plus all brand extensions, flavors, sizes or packages thereof (whether offered for sale before or after the Effective Date) subject to the provisions of Section 10 below.

k.   "SG NSV" shall mean SG's gross sales of Products based on SG's list price, less marketing and promotional discounts related to the Products offered and actually taken on the invoices.

l.   "Territory" shall mean the states set forth on <u>Exhibit A</u> attached hereto.

-2-

Confidential

    m. "Total Consideration" with respect to a Change of Control shall mean the total cash consideration, or the fair market value of any non-cash consideration, directly or indirectly paid to, transferred to, received by, or otherwise acquired by, as the case may be (i) Supplier or (ii) the owners of the equity interests in Supplier, <u>plus</u> the cumulative amount of profit distributions made to the owners of the equity interests in Supplier from the Effective Date to the date of the Change of Control. Notwithstanding the foregoing, "Total Consideration" will not include compensation and benefits paid to an owner of equity interests in Supplier that is paid in the ordinary course, consistent with Supplier's past practice prior to the Change of Control, and is not paid as a result of the Change of Control transaction.

2. <u>Appointment</u>.

    a. Supplier appoints Southern Glazer as the sole and exclusive distributor and/or broker, as applicable, of the Products for the Territory. Supplier agrees that it will not sell direct to retailers in the Territory, even if permitted by law. Where permitted by law to do so, Supplier may sell direct to consumers residing in the Territory in a face to face transaction with the consumer at the Supplier's place of manufacture (e.g., winery, brewery or distillery or place of business with proper licenses) or by direct shipment to the consumer pursuant to an order placed by phone, mail or on-line by that consumer, provided that Supplier shall not sell Products at lower than MSRP. All sales of Product in the United States and Canada will be included in the total Cases for purposes of calculating payments due under Section 11.

    b. Southern Glazer accepts the foregoing appointment, provided that, Southern Glazer may appoint sub-distributors for the purpose of selling the Products in the Territory.

3. <u>Term</u>. The initial term of this Agreement commences on the Effective Date and ends five (5) years thereafter (the "<u>Initial Term</u>"), unless sooner terminated in accordance with Section 12. Upon the expiration of the Initial Term, this Agreement shall automatically renew for successive five (5) year periods (each a "<u>Renewal Term</u>" and together with the Initial Term, referred to as the "<u>Term</u>"), unless sooner terminated in accordance with Section 12.

4. <u>Terms of Sale and Payment</u>. The following terms shall apply to sales in U.S. distribution states, to vendor of record sales in U.S. control states, and to sales in the Canadian provinces of Alberta and British Columbia:

    a. All orders for the Products by Southern Glazer shall be submitted to Supplier in a mutually acceptable format in advance of the requested delivery date.

    b. Supplier shall sell domestic Products to Southern Glazer FOB or FCA Supplier's designated warehouse.

    c. Payment for the Products shall be due 30 days from the invoice date, which shall be the same date as shipping.

-3-

Confidential

DocuSign Envelope ID: 89AA799C-46B5-46F8-87AD-8D205DBF4D3E

d.   The prices of the Products as of the Effective Date are set forth on <u>Exhibit C</u> and shall remain in effect for the first Contract Year.  Thereafter, Supplier may increase the price of the Products upon ninety (90) days prior written notice to Southern Glazer, but in no event more than one time during each Contract Year unless by mutual agreement of the parties due to unforeseen market circumstances. Notwithstanding the preceding, prices charged to Southern Glazer shall not be greater than prices offered to any other distributor of Supplier in the Territory.  Price increases of the Products shall take into account then current market conditions. Depletion allowances offered by Supplier shall not exceed ten percent (10%) of the FOB, FCA, or ExWorks price of the Products.

e.   All carriers engaged to ship the Products from Supplier to Southern Glazer (or any distributor designated by Southern Glazer in the Territory) shall be the agents of Southern Glazer. The risk of loss thereon shall pass to Southern Glazer upon delivery of the Products to such carrier. Southern Glazer shall have the right to determine the point of destination in the Territory and the method of shipment of the Products.

5.   <u>Terms of Brokerage</u>. With respect to any state or province within the Territory in which Southern Glazer serves as a broker, the following terms shall apply:

a.   Southern Glazer shall obtain orders for the Products from customers within the Territory at such prices that shall be fixed for the Products from time to time by Supplier.   Southern Glazer shall promptly notify Supplier in writing of all orders obtained by Southern Glazer.

b.   <u>Commissions in U.S.</u>  Supplier shall pay to Southern Glazer a commission equal to twelve percent (12%) of the invoiced price of the Products sold by Supplier to the customers within thirty (30) days from the end of each month in which commissions were earned, provided that the commission for wine in Mississippi, if included in Territory, will be thirteen percent (13%).  The data from the National Alcohol Beverage Control Association, or if no such data is available, then from the applicable state control board, shall be used to determine the commissions owed to Southern Glazer.

c.   <u>Compensation in Canada</u>.  Supplier shall pay to Southern Glazer a commission equal to twelve percent (12%) of the purchases by the liquor control boards of each province within the Territory other than British Columbia and Alberta for Products. Commissions shall be calculated on the delivered price to the customer and shall be payable by the 15th of each month for purchases made the previous month.  With respect to British Columbia and Alberta, Southern Glazer will purchase Products from Supplier at pricing that will provide Southern Glazer with a twelve percent (12%) margin, and Southern Glazer will sell Products to the liquor control boards on a consignment basis, with the payments from the British Columbia and Alberta Liquor Control Boards being made to Southern Glazer. Commissions will be based on regular selling price and not on discounted prices.

6.   <u>Representations and Warranties of Southern Glazer</u>.  Southern Glazer represents, warrants and

Confidential

covenants to Supplier as follows:

a. Southern Glazer shall use commercially reasonable efforts to

(i)  Sell, market, and promote the Products in the Territory;

(ii)  Maintain a sales force of adequate size to represent and promote the sales of the Products throughout the Territory;

(iii) Maintain sufficient inventories of the Products to adequately meet demand in the Territory;

(iv) Promptly deliver the Products to its customers in accordance with good business practice and local custom;

(v)  Timely file all price schedules and reports as may be prescribed by applicable laws and regulations.

b. Southern Glazer shall provide at its expense three (3) promotional employees (each a "Marketing Manager"), to be hired at least thirty (30) days from the date Product is first shipped from France, during the Term. The Marketing Managers shall be qualified and experienced to sell the Products and their full-time duties shall be dedicated exclusively to the sales and promotion of the Products in the Territory (and not elsewhere). The Marketing Managers will report to the Senior Vice President for Wine, who will manage the Marketing Managers giving due consideration to the advice of Supplier's Chief Executive Officer. Notwithstanding anything to the contrary herein, the Marketing Managers must adhere in all material respects to the brand strategy, standards, approach and guidelines of Supplier (collectively, as reasonably amended by Supplier from time to time, the "<u>Brand Standard</u>"). Any Marketing Manager who fails to comply in all material respects shall be replaced upon written request from Supplier upon fulfillment of Southern Glazer's standard discipline and other employment policies. Subject to the foregoing sentence, the decision to terminate, retain or reassign the Marketing Manager shall be Southern Glazer's alone and nothing contained in this Agreement shall be construed as granting to the Marketing Manager any right to be retained in the Southern Glazer's employ or as interfering with or limiting the sole and exclusive right of the Southern Glazer to terminate the employment of the Marketing Manager or to change such individual's duties so that the individual is no longer acting as the Marketing Manager. Southern Glazer hereby acknowledges and agrees that the Marketing Manager is and shall at all times during the term of this Agreement be deemed to be its employee and nothing contained herein shall be construed to provide that the Marketing Manager is an employee of Supplier.

c. Southern Glazer shall expend $500,000 for local marketing activities (the "Local Marketing Fund" or "LMF") during the Term. The LMF will be used for promotional activities in the Territory as mutually agreed upon by the parties, including, but not limited to, sales incentives, samples, menus and drink lists, local point of sale materials, display enhancers, charitable contributions, non-structural price support, and similar

Confidential

expenditures, all subject to applicable law. If there are any funds in the LMF upon the termination of this Agreement pursuant to Section 12, then Southern Glazer shall be entitled to retain the funds.

d. Upon execution of the Effective Date, Southern Glazer shall place a non-cancelable order for 4,000 Cases of the Products at the price set forth in Exhibit C. The delivery of the order shall occur within the first Contract Year. Delivery of the order will be coordinated between Southern Glazer and Supplier and shall be delivered to locations in the Territory mutually agreed upon by the parties.

7. Representations and Warranties of the Parties. Each party represents, warrants, and covenants to the other as follows:

a. The party has the authority to enter into and carry out its obligations under this Agreement.

b. The execution and delivery of this Agreement and the consummation of the transactions contemplated by this Agreement will not act as a breach of any contract or agreement to which the party is obligated.

c. The party has the requisite federal, state, and local licenses to conduct its business in all material respects necessary to fulfill its obligations under this Agreement.

d. The parties shall comply with all federal, state and local laws and regulations applicable to its performance under this Agreement.

e. A party that is owed a past due amount shall have the right to offset such amount against amounts owed by that party.

f. Each Contract Year, the parties shall develop a mutually agreed upon annual business plan for the distribution of the Products ("Annual Business Plan"). The Annual Business Plan for the first Contract Year is attached hereto as Exhibit D. Annual Business Plans for future Contract Years will be developed no later than sixty (60) days prior to the start of the upcoming Contract Year. The Annual Business Plan shall include Southern Glazer's goals for depletion of the Products to its licensed retail customers in the Territory, as well as the number of distribution points to be achieved by Southern Glazer with respect to the Products in the Territory. The goals shall take into account, among other things, brand/market size and potential, benchmarks against competitive products and current market trends, channel dynamics, and market conditions.

8. Additional Representations and Warranties of Supplier. Supplier represents, warrants, and covenants to Southern Glazer as follows:

a. The Products shall be merchantable and fit for human consumption. The Products, and any and all related packaging, labels, point of sales materials, and other promotional

SMRH:485697106.10

-6-

materials shall be manufactured, packaged, and labeled in conformity with applicable federal, state, and local laws, rules, and regulations, including but not limited to the rules and regulations of the CIVC, U.S. Alcohol and Tobacco, Tax and Trade Bureau, U.S. Department of Homeland Security, U.S. Food and Drug Administration and California's Safe Drinking Water and Toxic Enforcement Act of 1986 (Prop 65), which shall be applicable regardless of the law which otherwise would govern this Agreement.

b.   Any and all amounts due and payable to Southern Glazer by Supplier pursuant to this Agreement shall be paid within thirty (30) days from the date of the invoice.   The parties shall cooperate with each other to set up EFT payments promptly after the Effective Date.

c.   All shipments of the Products will conform to the samples of the Products that have been furnished to Southern Glazer.

d.   Supplier shall maintain an adequate inventory of the Products with which to supply Southern Glazer. Supplier shall accept all reasonable orders submitted by Southern Glazer, with shipment to follow not later than sixty (60) days from receipt of an order unless otherwise agreed by the parties. The Products shall be sold free and clear of all liens.

e.   Supplier shall utilize commercially reasonable efforts to prevent the sale of unauthorized shipments of the Products in the Territory by entities or persons other than Southern Glazer. In this regard, Supplier shall not sell or otherwise transfer the Products to any wholesaler or distributor located outside the Territory whom Supplier knows, or has reason to believe, will either directly or indirectly, sell or otherwise transfer the Products into the Territory.

f.   Supplier has made the independent decision to appoint Southern Glazer as the exclusive distributor (or broker if applicable) of the Products in the Territory.

g.   Supplier has no agreement with any other distributor for the sale of the Products in the Territory; there are no pending or threatened claims by any third party or distributor against Supplier arising out of or relating to the distribution of the Products in the Territory; and, the prior distributor (or broker as applicable) has not made any material payments to Supplier, except in the ordinary course of purchasing Products.

h.   The Products, the marketing and promotion of the Products by Supplier or by Southern Glazer as permitted by this Agreement, as well as the trademarks, trade dress, trade secrets, copyrights, patents, and other intellectual property (collectively, "Intellectual Property") associated with the Products will not infringe the rights or Intellectual Property of any third party.  Supplier represents and warrants that it has the exclusive and unrestricted right in the Territory to use all of the Intellectual Property associated with the Products, and, subject to adherence with the Brand Standards, grants to Southern Glazer the exclusive and unrestricted right to use the Intellectual Property associated with the Products in connection with the marketing, sale, and promotion of the Products in the Territory in accordance with this Agreement.

SMRH:485697106.10

-7-

SGWS 0002390

9. <u>Insurance; Product Returns and Indemnification.</u>

    a.   Supplier shall maintain in full force and effect general liability insurance, with product hazard coverage in an amount of not less than $3,000,000 for a single accident occurrence or in the aggregate. Supplier's insurance shall name Southern Glazer and its affiliates as additional insureds and contain a broad form vendor's endorsement. Supplier shall, upon request, furnish to Southern Glazer a certificate confirming such coverage. Supplier shall require the insurance provider to provide Southern Glazer with written notice of the termination or non-renewal of such coverage thirty (30) days prior to such termination or non-renewal occurring.

    b.   Any Products not merchantable due to quality deficiencies, including packaging problems or errors committed by Supplier or its suppliers, may be returned to Supplier for full credit at Southern Glazer's total Laid-in Cost (including the cost of return shipping), provided that notice of such deficiency, problem, or error has been given to Supplier within 60 days after the defect has become known to Southern Glazer. In the event there are no amounts due to Supplier to offset the credit for such unmerchantable Products, Southern Glazer shall be entitled to a cash refund equal to the amount of the credit. Additionally, Supplier shall assist Southern Glazer and be responsible for all costs in connection with any Product recall so long as Southern Glazer is not the sole cause of such recall.

    c.   Supplier shall defend, indemnify, and hold harmless Southern Glazer and its parent, subsidiaries and affiliates and each of their respective officers, directors, shareholders, members, employees, representative, agents, subsidiaries, affiliates, and parent (collectively, the "<u>Related Parties</u>") against any and all damages, liabilities, costs, attorneys' fees and expenses ("<u>Claims</u>"), which Southern Glazer or its Related Parties may suffer to the extent resulting from or arising out of: (i) the Products (or any recall thereof), Supplier's point-of-sale material (whether or not owned by Southern Glazer), or any other promotional and/or marketing programs related to the Products; (ii) a breach of any of Supplier's representations, warranties, and obligations set forth herein; or, (iii) the distribution of the Products by Southern Glazer in accordance with the terms of this Agreement; provided, however, that Supplier shall not be liable for such Claims to the extent resulting from the actions or inactions of Southern Glazer or its Related Parties.

    d.   Southern Glazer shall defend, indemnify, and hold harmless Supplier and its Related Parties from and against any and all Claims which Supplier or its Related Parties may suffer to the extent resulting from or arising out of: (i) a breach of any of Southern Glazer's representations, warranties, and obligations set forth herein; or (ii) the distribution of the Products by Southern Glazer not in accordance with the terms of this Agreement; provided, however, that Southern Glazer shall not be liable for such Claims to the extent resulting from the actions or inactions of Supplier or its Related Parties.

10. <u>New Products and New Territories.</u> Supplier grants Southern Glazer a right of first refusal to be appointed as the exclusive distributor (or broker where applicable) of the Products or New

Confidential      SGWS 0002391

DocuSign Envelope ID: 89A A7986-42B5-46F9-B7AE-8D20BD5E4D3E

Products under the same terms and conditions of this Agreement in the following circumstances:

a. In any state in which Southern Glazer operates as of the Effective Date and in which Supplier does not, as of the Effective Date, have an exclusive distributor or broker of the Products.

b. If, after the Effective Date, Southern Glazer, directly or through an affiliate, commences operations in a state that is not in the Territory and Supplier does not at that time have an exclusive distributor or broker of the Products in such state.

c. If Supplier has an exclusive distributor or broker of the Products in a state that is not in the Territory, but, for whatever reason, such distributor or broker ceases being the exclusive distributor or broker in that state.

d. In any state where Supplier has a distributor or broker other than Southern Glazer if: (i) Supplier is lawfully permitted to terminate its existing agreement with such current distributor (and Southern Glazer pays for any termination payment in connection with such termination) and Southern Glazer agrees, in writing, to indemnify Supplier for any claims by such distributor resulting from such termination; or (ii) Southern Glazer is able to obtain a release of all claims against Supplier from such distributor.

e. For any and all future products (collectively, "New Products") which Supplier desires to sell in the Territory. If Supplier withdraws any Product (or New Product) from sale in the Territory, then Southern Glazer shall be granted the exclusive right to broker or distribute, as applicable, such Product (or New Product) in the Territory if it is reintroduced by Supplier.

Supplier shall advise Southern Glazer of the existence of the right granted in this section not later than thirty (30) days after it arises. Any right of first refusal granted in this section shall be exercisable by Southern Glazer within thirty (30) days after Supplier provides notice of the existence of the right and shall be assignable by Southern Glazer to its affiliates.

11. <u>Change of Control</u>. Supplier acknowledges that Southern Glazer will incur significant time and expense in connection with the sales, marketing and distribution efforts to develop the brand recognition of the Products and the Intellectual Property associated therewith. Accordingly, the following shall be applicable:

a. In the event of a Change of Control, Supplier shall pay to Southern Glazer the Initial Percentage of the Total Consideration within thirty (30) days of the Change of Control.

b. In addition to the foregoing, in the event of a Change of Control, Supplier shall pay to Southern Glazer the Additional Percentage of the Total Consideration within thirty (30) days of the Change of Control.

In the event Supplier sells, transfers or otherwise disposes of a Product or the Intellectual

Confidential                                                                                   SGWS 0002392

Property associated with a Product, but does not have a Change of Control, then Supplier shall make the payment set forth in this Section 11(a) and (b) with respect to the Product that is the subject of such sale, transfer or disposition, with the amount of the payment measured using the Total Consideration and Cases associated with the Product.

12. Termination.

 a. Supplier may terminate this Agreement by giving written notice to Southern Glazer for any of the following grounds:

  (i) Southern Glazer has suffered the loss of any material federal or state license required by law and necessary in carrying out the material provisions of this Agreement for a period in excess of thirty (30) days.

  (ii) Southern Glazer has failed to make payment of any undisputed invoice in accordance with the credit terms set forth in Section 4(b) above and has not remedied the failure after 10 days written notice.

  (iii) Southern Glazer has failed to fulfill any other material terms and conditions of this Agreement and has not remedied the failure within 30 days after receipt of written notice from Supplier or if such failure cannot be reasonably cured within 30 days, Southern Glazer has not diligently implemented a corrective plan within thirty (30) days from receipt of written notice thereof to cure such failure within one 90 days.

 b. Southern Glazer may terminate this Agreement by giving written notice to Supplier for any of the following grounds:

  (i) Supplier has failed to fulfill any of the material terms and conditions of this Agreement and has not remedied such failure within thirty (30) days after receipt of written notice thereof.

  (ii) At any time, in its entirety or as to one or more states in the Territory, without cause and without liability to Supplier upon providing Supplier with ninety (90) days' prior written notice.

 c. Either party may terminate this Agreement immediately and without notice upon the grounds that:

  (i) There has been filed by the other party a voluntary petition in bankruptcy or arrangement under a national or federal bankruptcy statute or other voluntary proceedings under any national, federal, or local laws for the settlement or extension of payment of its obligations to general creditors.

  (ii) An involuntary lien or petition in bankruptcy has been filed against the other

Confidential

party and such involuntary lien or petition has not been dismissed within ninety (90) days.

13. <u>Events following Termination</u>. Upon the expiration or termination of this Agreement by either party, the following shall apply:

    a.   All rights, licenses, and privileges granted to Southern Glazer under this Agreement shall immediately cease and terminate.

    b.   Southern Glazer shall discontinue the use of the Intellectual Property related to the Products.

    c.   Supplier shall purchase any and all of the Products and all other material bearing the Intellectual Property related to the Products, then owned by Southern Glazer, at its Laid in Cost (including cost of return shipping, plus any nonrefundable gallonage taxes, if any, paid by Southern Glazer).

    d.   Any indebtedness of either party to the other not already due shall become immediately due and payable as of the effective date of termination of this Agreement.

    e.   The parties shall reconcile their accounts within thirty (30) days from the effective date of termination and the party owing money shall make such payment within ten (10) days from mutual agreement on the reconciliation of accounts.

    f.   Section 11(a) shall survive termination of this Agreement.

14. <u>Choice of Law and Disputes.</u>

    a.   This Agreement, the relationship between the parties, and any disputes related hereto shall be governed by the laws of the State of Florida without regard to its choice of law provisions. Notwithstanding the preceding, to the extent any state within the Territory has a body of law or regulation that exists which is generally known or referred to in the alcoholic beverage industry as a "distributor discrimination" or "franchise protection" law or any other similar law, then the law of such state shall govern this Agreement for that particular state in the Territory. Furthermore, nothing contained in this Agreement shall reduce, modify, or diminish any franchise protection or other similar rights that Southern Glazer may have in any state within the Territory.

    b.   Any disagreement or dispute between the parties shall be submitted by the parties to arbitration in New York, NY in accordance with the rules of JAMS, Inc. ("<u>JAMS</u>") for complex cases, before one neutral arbitrator, chosen in accordance with JAMS rules. Each party waives any objection to venue in New York, NY based upon lack of personal jurisdiction, improper venue or forum non conveniens.

    c.   Any award made the arbitrator shall be final and binding upon the parties and judgment thereon may be entered in any court of competent jurisdiction.

SMRH:485697106.10

Confidential

15. Business Records Related to the Products; Confidentiality.

    a.  Southern Glazer will provide Supplier with such reports as Supplier may reasonably request regarding the Products in the Territory, including, but not limited to, bi-monthly (i.e., at the beginning and middle of each month) reports of inventories, sales, and depletions of the Products in the Territory.

    b.  Information disclosed by one party (the "Disclosing Party") to the other party (the "Receiving Party") constituting trade secrets, proprietary or confidential information, or any other information which could give a competitor of the Disclosing Party a competitive advantage it would not otherwise have absent the knowledge of such information (the "Confidential Information") shall be kept confidential and shall not be disclosed by the Receiving Party, except to its employees, consultants, accountants, attorneys, and lenders with a need to know, and then only to the extent necessary and only if such persons have, or agree to, an obligation of confidentiality. Confidential Information excludes information which Receiving Party can clearly establish: (a) is in the public domain through no fault of the Receiving Party, (b) was known to it, without restriction on disclosure thereof, prior to disclosure by Disclosing Party, or (c) is independently developed by Receiving Party without use of or reference to Confidential Information.

    c.  If a Receiving Party is required to disclose any of the Confidential Information by operation of law, court order or other governmental demand ("Process"), this Agreement shall not prohibit the release of Confidential Information pursuant to the Process provided that: (i) the Receiving Party shall immediately notify the Disclosing Party of such Process (if legally permissible); (ii) the Receiving Party shall not produce or disclose Confidential Information in response to the Process unless the Disclosing Party has: (x) requested protection from the legal or governmental authority requiring the Process and such request has been denied, (y) consented in writing to the production or disclosure of the Confidential Information in response to the Process, or (z) taken no action to protect its interest in the Confidential Information within seven (7) business days after receipt of written notice from the Receiving Party of its obligation to produce or disclose Confidential Information in response to the Process; and (iii) the Receiving Party shall release only the Confidential Information required to be released by the Process.

    d.  Supplier acknowledges and agrees that data and information regarding Southern Glazer's purchases, inventory, and sales of the Products (including without limitation pricing) are Confidential Information of Southern Glazer, and, as such, may be shared by Southern Glazer with third party information providers (e.g., VIP, IRI and AC Nielsen). This Agreement shall be considered Confidential Information of both parties and may not be disclosed unless both parties consent.

    e.  Supplier agrees that it will not issue any press release, announcement, or any other communication that pertains to the existence of this Agreement or any of the terms

Confidential

contained herein without the prior written consent of Southern Glazer, which consent shall be at Southern Glazer sole discretion; provided, however that Supplier shall solely be permitted to indicate on its Internet domain site that Southern Glazer is the exclusive distributor of the Products in the Territory.

16. <u>Force Majeure</u>. Neither party shall be liable for damages or have the right to terminate this Agreement for any delay or default in performing hereunder if such delay or default is wholly or in part caused by acts of God, strikes, lockouts, acts of war or terrorism, civil disturbances, floods, hurricanes, earthquakes, tornadoes, changes in law, or any other causes that are not within that party's reasonable control ("<u>Force Majeure</u>"), and the obligations of that party, so far and for as long as they are affected by such Force Majeure, shall be excused and suspended.

17. <u>Severability</u>. In the event any of the terms and provisions of this Agreement are in violation of, or prohibited by, any applicable law or regulation, such terms and provisions shall be deemed modified or deleted to conform for such law or regulation without invalidation or amending or deleting any of the other terms or conditions of this Agreement.

18. <u>Assignment of Agreement</u>. Subject to the provisions of Section 11, neither party may assign this Agreement without the prior written consent of the other.  Notwithstanding the preceding, Southern Glazer may assign this Agreement to any successor in interest, as well as an entity that is wholly-owned by Southern Glazer.  The terms and obligations of this Agreement shall inure to the benefit of any permitted assignee or successor of either party.

19. <u>Relationship of the Parties</u>. The parties acknowledge that no joint venture has been created by this Agreement, and that neither party can take any action which is legally binding on the other without the prior written consent of the party to be charged. In no event shall either party be liable for any debts of the other party to its customers or its other creditors.

20. <u>Financing</u>. Supplier represents that there are currently 4,400,069 membership units outstanding and Supplier covenants that it will not offer additional equity for any purpose other than to raise capital.  If Supplier desires to offer additional equity to raise capital, then Supplier shall first give notice to SG indicating the amount of financing sought (a "Capital Raise Notice"). SG shall have 30 days from delivery of the Capital Raise Notice to purchase enough cases of Products so as to provide the net cash flow (net of costs and expenses, including amounts paid to SG) sought by Supplier in the Capital Raise Notice.  If SG makes such purchase ("Capital Raise Purchase"), then Supplier shall not sell additional equity to raise capital for at least 12 months following the delivery by Supplier of its notice (after which time, Supplier would have to undergo the Capital Raise Notice procedure described in this Section and provide SG with the option to make a Capital Raise Purchase following each such notice).  If SG does not make a Capital Raise Purchase following the corresponding Capital Raise Notice, then Supplier shall no longer be required to provide SG with the opportunity to make a Capital Raise Purchase.

21. <u>Miscellaneous</u>.

   a. Any demand, notice, or request provided for by this Agreement shall be in writing, and shall be made by hand delivery, by registered or certified mail, or by a nationally

Confidential

DocuSign Envelope ID: 89A47980-48BE-4658-87AB-8D20BDBE4D3E

recognized overnight courier, addressed to the party to whom notice is to be given or to whom a demand or request is to be made. Notices shall be deemed delivered upon actual receipt.  The addresses of the parties are as follows:

If to Southern Glazer:

Southern Glazer's Wine and Spirits, LLC
1600 N.W. 163rd Street
Miami, Florida 33169
Attention: Wayne E. Chaplin, Chief Executive Officer
With a copy to: Alan N. Greenspan, EVP and General Counsel

If to Supplier:

Select Three, LLC
8700 Melrose Avenue
West Hollywood, CA 90069
Attention: Brent Hocking, Chief Executive Officer

b.   This Agreement represents the entire agreement between Southern Glazer and Supplier, and supersedes all prior oral and written arrangements and agreements, and may not be changed, except by a written agreement or amendment to this Agreement signed by the chief executive officer of both parties. If Southern Glazer accepts appointment pursuant to Section 10 in a state not in the Territory as of the Effective Date or of New Products, then Exhibit A or B, respectively, shall be amended accordingly and this Agreement will govern; however, the failure to amend Exhibit A or B shall not deprive Southern Glazer of its rights under this Agreement in the new state or with respect to New Products.

c.   Except as otherwise expressly provided herein, any failure by a party to exercise any of its rights under this Agreement shall not be construed as a waiver of such rights, and such failure shall not preclude exercise of such rights at any later time.  The exercise of any right or remedy shall not prejudice or impair the concurrent or subsequent exercise of other rights or remedies.  Notwithstanding the foregoing, a party must exercise its right to terminate within six (6) months of its knowledge of the event giving rise to the right to terminate or the right to terminate on the grounds of such event shall be waived unless the same or another termination event re-occurs.

d.   Section headings are for convenience only and are not to be construed as part of this Agreement.

e.   In any legal action or proceeding (including arbitration) between the parties, the party prevailing in any such action or proceeding shall be entitled to recover from the non-prevailing party all reasonable attorneys' fees, expert witness fees, costs and expenses (including the expenses of arbitration) incurred by the prevailing party in conjunction

Confidential                                                                            SGWS 0002397

with the action or proceeding in addition to any other relief to which such prevailing party is entitled.  The finder of fact will determine the identity of the prevailing party.

f.   In the event any ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement.

g.   EXCEPT FOR THE EXPRESS REPRESENTATIONS AND WARRANTIES CONTAINED IN THIS AGREEMENT, (A) NEITHER PARTY TO THIS AGREEMENT, NOR ANY OTHER PERSON ON SUCH PARTY'S BEHALF, HAS MADE OR MAKES ANY EXPRESS OR IMPLIED REPRESENTATION OR WARRANTY, EITHER ORAL OR WRITTEN, WHETHER ARISING BY LAW OR OTHERWISE, ALL OF WHICH ARE EXPRESSLY DISCLAIMED, AND (B) EACH PARTY ACKNOWLEDGES THAT IT HAS NOT RELIED UPON ANY REPRESENTATION OR WARRANTY MADE BY THE OTHER PARTY, OR ANY OTHER PERSON ON SUCH PARTY'S BEHALF, EXCEPT AS SPECIFICALLY PROVIDED IN THIS AGREEMENT.   EXCEPT FOR LIABILITY FOR INDEMNIFICATION, LIABILITY FOR BREACH OF CONFIDENTIALITY, OR LIABILITY FOR INFRINGEMENT OR MISAPPROPRIATION OF INTELLECTUAL PROPERTY RIGHTS, IN NO EVENT SHALL EITHER PARTY BE LIABLE UNDER THIS AGREEMENT TO THE OTHER PARTY FOR CONSEQUENTIAL, INDIRECT, INCIDENTAL, SPECIAL, EXEMPLARY, PUNITIVE OR ENHANCED DAMAGES, ARISING OUT OF, OR RELATING TO, AND/OR IN CONNECTION WITH ANY BREACH OF THIS AGREEMENT, REGARDLESS OF (A) WHETHER SUCH DAMAGES WERE FORESEEABLE, (B) WHETHER OR NOT IT WAS ADVISED OF THE POSSIBILITY OF SUCH DAMAGES, AND (C) THE LEGAL OR EQUITABLE THEORY (CONTRACT, TORT OR OTHERWISE) UPON WHICH THE CLAIM IS BASED.  Any sales goals or marketing plans are neither warranties nor guaranties of performance and are merely aspirational.

h.   The parties agree to: (i) execute and deliver to each other such other documents, and (ii) do such other acts and things, all as the other party may at any time reasonably request, for the purpose of carrying out the intent of this Agreement.

i.   The following provisions of this Agreement shall survive the termination or expiration of this Agreement: Sections 9(c), 9(d), 11(a), 13, 14, 15, 17 and 21.

j.   This Agreement may be executed in counterparts, each of which shall be deemed an original and all of which together shall be deemed to be one and the same instrument. Facsimile or electronic signatures of this Agreement shall have the same force and effect as the original signatures.

k.   The parties hereby specifically request that this Agreement and all documents related hereto be drawn up and signed in the English language only.  *Les parties aux présentes*

Confidential                                                                                            SGWS 0002398

*exigent que cette convention ainsi que tous les documents y afférents soient rédigés et signés en langue anglaise seulement.*

*[Signature Page Follows]*

Confidential                                                                    SGWS 0002399

The parties have caused their duly authorized representatives to execute this Agreement on behalf of the parties as of the date first written above.

**SOUTHERN GLAZER (ON BEHALF OF THE ENTITIES ON EXHIBIT A)**:

By: _Wayne Chaplin_

Name: wayne Chaplin

Its: Chief Executive Officer

**SUPPLIER**:

**SELECT THREE, LLC**

By: _____

Brent Hocking
President and Chief Executive Officer

Confidential

## EXHIBIT A

## SOUTHERN GLAZER'S: CONTRACTING ENTITIES BY STATE AND PROVINCE

| STATE/ PROVINCES | WHOLESALE Operating Entity | BROKERAGE Operating Entity |
|---|---|---|
| Alabama | | Southern Glazer's Wine and Spirits Gulf Coast, LLC |
| Alaska | Southern Glazer's Wine and Spirits of Alaska, LLC | |
| Arizona | Southern Glazer's Wine and Spirits, LLC | |
| California | Southern Glazer's Wine and Spirits, LLC | |
| Colorado | Southern Glazer's Wine and Spirits of Colorado, LLC | |
| Delaware | Southern Glazer's Wine and Spirits of Delaware, LLC | |
| District of Columbia | Southern Glazer's Wine and Spirits of Maryland, LLC | |
| Florida | Southern Glazer's Wine and Spirits, LLC | |
| Hawaii | Southern Glazer's Wine and Spirits, LLC | |
| Idaho | Southern Glazer's Wine Distributors of Idaho, LLC | |
| Illinois | Southern Glazer's Wine and Spirits of Illinois, LLC | |
| Indiana | Southern Glazer's Wine and Spirits of Indiana, LLC | |
| Iowa | Southern Glazer's Distributors of Iowa, LLC | |
| Kentucky | Southern Glazer's Wine and Spirits of Kentucky, LLC | |
| Louisiana | Southern Glazer's Wine and Spirits of Louisiana, LLC | |
| Maine | | Southern Glazer's Wine and Spirits of New England, LLC |
| Maryland | Southern Glazer's Wine and Spirits of Maryland, LLC | |
| Michigan | | Southern Glazer's Wine and Spirits of Michigan, LLC |
| Minnesota | Southern Glazer's Wine and Spirits of Minnesota, LLC | |
| Mississippi | | Southern Glazer's Wine and Spirits Gulf Coast, LLC |
| Missouri | Southern Glazer's Wine and Spirits of Missouri, LLC | |
| Montana | | Southern Glazer's Wine and Spirits-Pacific Northwest Brokerage, LLC |
| Nebraska | Southern Glazer's Wine and Spirits of Nebraska, LLC | |
| New Hampshire | | Southern Glazer's Wine and Spirits of New England, LLC. |
| New York | Southern Glazer's Wine and Spirits of New York, LLC Southern Glazer's Wine and Spirits of Upstate New York, LLC | |
| North Carolina | | Southern Glazer's Wine and Spirits Mid Atlantic, LLC |
| North Dakota | Southern Glazer's Wine and Spirits of North Dakota, LLC | |
| Oklahoma | | Southern Glazer's Wine and Spirits of Oklahoma, LLC |
| Oregon | Southern Glazer's Wine Distributors of Oregon, LLC | |
| Pennsylvania | | Southern Glazer's Wine and Spirits of Pennsylvania, LLC |
| South Carolina | Southern Glazer's Wine and Spirits of South Carolina, LLC | |
| South Dakota | Southern Glazer's Wine and Spirits of South Dakota, LLC | |
| Texas | Southern Glazer's Wine and Spirits of Texas, LLC | |
| U.S. Virgin Islands | Southern Glazer's Wine and Spirits of the Caribbean, LLC | |
| Utah | | Southern Glazer's Wine and Spirits-Pacific Northwest Brokerage, LLC |
| Vermont | | Southern Glazer's Wine and Spirits of New England, LLC |
| Virginia | | Southern Glazer's Wine and Spirits Mid Atlantic, LLC |
| Washington | Southern Glazer's Wine and Spirits of Washington, LLC | |
| West Virginia | | Southern Glazer's Wine and Spirits Mid Atlantic, LLC |
| Wyoming | | Southern Glazer's Wine and Spirits-Pacific Northwest Brokerage, LLC |
| All Provinces of Canada | | Southern Glazer's Wine and Spirits of Canada, LLC |

NTD: Franchise states are not included in this contract

SMRH:485697106.10

-18-

**EXHIBIT B**

Products

**MOD CHAMPAGNE**

Confidential                                                                                     SGWS 0002402

# Mod Sélection
# Champagne Variants

1. Réserve
2. Rosé

3. Vintage 2008
4. Vintage Rosé 2008
5. Vintage 2008 Blanc de Blancs

6. Brut
7. Brut Rosé

8. NV Blanc de Blancs
9. NV Blanc de Noir

SGWS 0002403

**EXHIBIT C**

Pricing

Product Size                                    Price per Case

Confidential                                                        SGWS 0002404

DocuSign Envelope ID: 89AA799C-46BE-46FB-B7AD-8D20BDBF4D3F

SGWS 0002405

## Mod Sélection Champagne

| Variants | 750ML Wholesale Pricing | 9L Case Wholesale Pricing |
|---|---|---|
| Réserve | $150.00 | $1,800.00 |
| Rosé | $200.00 | $2,400.00 |
| Vintage 2008 | $175.00 | $2,100.00 |
| Vintage Rosé 2008 | $350.00 | $4,200.00 |
| Vintage "Blanc de Blancs" 2008 | $300.00 | $3,600.00 |
| Brut | $120.00 | $1,440.00 |
| Brut Rosé | $140.00 | $1,680.00 |
| NV Blanc de Blancs | $175.00 | $2,100.00 |
| NV Blanc de Noir | $175.00 | $2,100.00 |

**\*Champagne pricing estimated and subject to change.**

Confidential

DocuSign Envelope ID: 89AA789C-46BE-46E9-B7AD-9D2B5DBF4D35

**EXHIBIT D**

ANNUAL BUSINESS PLAN FOR FIRST CONTRACT YEAR

Confidential                    SGWS 0002406

DocuSign Envelope ID: 89AA799C-46BE-46FB-B7AD-8D20BDBF4D3F

SGWS 0002407



Confidential

SGWS 0002408

DocuSign Envelope ID: 89AA799C-46BE-46FB-B7AD-8D20BDBF4D3F

# CHAMPAGNE FIRST YEAR PROJECTIONS

## FROM JANUARY 1, 2018 THROUGH DECEMBER 31, 2018

COST TO PRODUCE 1 BOTTLE

| | |
|---|---|
| BOTTLE AND BASE CHAMPAGNE | $ 20.00 |
| EXTERIOR BOTTLE WRAP | $ 10.00 |
| SHIPPER AND INDIVIDUAL BOX | $ 10.00 |
| TOTAL COST PER BOTTLE | $ 40.00 |

** CAPACITY IN YEARS 6-10 ESCALATES TO 1.6 MILLION BOTTLES ANNUALLY BY YEAR 10

*** PROFIT DOES NOT INCLUDE HALF BOTTLES, MAGNUMS AND JEROBOAMS ESTIMATED CONSERVATIVELY AT $3 MILLION PROFIT ANNUALLY

Confidential

DocuSign Envelope ID: 89AA799C-46BE-46FB-B7AD-8D20BDBF4D3F

SGWS 0002409

# CHAMPAGNE FIRST YEAR PROJECTIONS

FROM JANUARY 1, 2018 THROUGH DECEMBER 31, 2018

| | YEAR 1 | YEAR 2 | YEAR 3 | YEAR 4 | YEAR 5 |
|---|---|---|---|---|---|
| WHOLESALE PRICE PER BOTTLE | $ 150.00 | | | | |
| BOTTLE SALES | 120,000 | 150,000 | 240,000 | 360,000 | 600,000 |
| CASES – 9 LITER | 10,000 | 15,000 | 20,000 | 30,000 | 50,000 |
| BOTTLES PER CASE | 12 | | | | |

** CAPACITY IN YEARS 6-10 ESCALATES TO 1.6 MILLION BOTTLES ANNUALLY BY YEAR 10

*** PROFIT DOES NOT INCLUDE HALF BOTTLES, MAGNUMS AND JEROBOAMS ESTIMATED CONSERVATIVELY AT 8 MILLION PROFIT ANNUALLY

Confidential

DocuSign Envelope ID: 89AA799C-46BE-46FB-B7AD-8D20BDBF4D3F

# CHAMPAGNE FIRST YEAR PROJECTIONS

### FROM JANUARY 1, 2018 THROUGH DECEMBER 31, 2018

**REVENUES**

| | |
|---|---|
| **DISTRIBUTOR SALES** | 18,000,000.00 |
| **TOTAL REVENUE** | 18,000,000.00 |

**COST OF GOODS SOLD — PER CASE**

| | |
|---|---|
| **BOTTLE AND BASE CHAMPAGNE** | 2,400,000.00 |
| **EXTERIOR BOTTLE WRAP** | 1,200,000.00 |
| **SHIPPER AND INDIVIDUAL BOX** | 1,200,000.00 |
| **TOTAL COST OF GOODS SOLD** | 4,800,000.00 |

| | | |
|---|---|---|
| **GROSS PROFIT** | 13,200,000.00 | 73.3% |

CONTINUED...

** CAPACITY IN YEARS 6-10 ESCALATES TO 1.6 MILLION BOTTLES ANNUALLY BY YEAR 10.

*** PROFIT DOES NOT INCLUDE HALF BOTTLES, MAGNUMS AND JEROBOAMS ESTIMATED CONSERVATIVELY AT $7 MILLION PROFIT ANNUALLY.

SGWS 0002410

Confidential

DocuSign Envelope ID: 89AA799C-46BE-46FB-B7AD-8D20BDBF4D3F

**FIRST YEAR BUDGET** CONTINUED...

## ANNUAL OPERATING EXPENSES

### ADVERTISING, MARKETING & PROMOTION

| | | |
|---|---|---|
| PUBLIC RELATIONS | 180,000 | 1% |
| PROMOTION EVENTS, TASTING EVENTS | 500,000 | 2.8% |
| SOCIAL MEDIA BRANDING | 360,000 | 2% |
| AD CAMPAIGNS | TV COMMERCIALS | 600,000 | 3.3% |
| MEALS & ENTERTAINMENT—ACCOUNT SUPPORT | 300,000 | 1.7% |
| DISTRIBUTOR BTL COSTS | 700,000 | 3.9% |
| **TOTAL ADVERTISING, MARKETING & PROMOTION** | 2,640,000 | 14.7% |

### ADMINISTRATIVE EXPENSES

| | | |
|---|---|---|
| INSURANCE | 100,000 | 0.6% |
| LEGAL AND ACCOUNTING | 300,000 | 1.7% |
| OFFICE EXPENSES | 150,000 | 0.8% |
| OFFICE RENT | 144,000 | 0.8% |
| TRAVEL | 300,000 | 1.7% |
| **TOTAL ADMINISTRATIVE EXPENSES** | 994,000 | 5.5% |

### SALARIES & WAGES

| | | |
|---|---|---|
| CEO | 500,000 | 2.8% |
| DEVELOPMENT DIRECTOR | 150,000 | 0.8% |
| EXECUTIVE ASSISTANT | 60,000 | 0.3% |
| PRODUCTION MANAGER | 150,000 | 0.8% |
| 3 SALES SUPERVISORS | 450,000 | 2.5% |
| ADMINISTRATIVE PAYROLL | 30,000 | 0.2% |
| BONUSES | 328,000 | 1.8% |
| **TOTAL SALARIES & WAGES** | 1,668,000.00 | 9.3% |

| | | |
|---|---|---|
| **TOTAL OPERATING EXPENSES** | 5,302,000.00 | 29.5% |
| **CHAMPAGNE NET INCOME** | 7,898,000.00 | 43.9% |

** CAPACITY IN YEARS FOR REGULARES TO 3.6 MILLION BOTTLES ANNUALLY BY YEAR 10.

*** PROFIT DOES NOT INCLUDE HALF-BOTTLES, MAGNUMS AND JEROBOAMS ESTIMATED CONSERVATIVELY AT $3 MILLION PROFIT ANNUALLY.

SGWS 0002411

Confidential

DocuSign Envelope ID: 89AA799C-46BE-46FB-B7AD-8D20BDBF4D3F



# CHAMPAGNE FIRST YEAR PROJECTIONS

FIRST YEAR BUDGET CONTINUED...

| ANNUAL OPERATING EXPENSES | | |
|---|---|---|
| TOTAL OPERATING EXPENSES | 5,302,000.00 | 29.5% |
| CHAMPAGNE NET INCOME | 7,898,000.00 | 43.9% |

** CAPACITY IN YEARS 6-10 ESCALATES TO 1.6 MILLION BOTTLES ANNUALLY BY YEAR 10.

*** PROFIT DOES NOT INCLUDE HALF BOTTLES, MAGNUMS AND JEROBOAMS (ESTIMATED CONSERVATIVELY AT 63 MILLION EUROS ANNUALLY).

SGWS 0002412

Confidential

DocuSign Envelope ID: 89AA799C-46BE-46FB-B7AD-8D20BDBF4D3F



SGWS 0002413

Confidential